The prisoner was charged in an indictment of six counts with burning an out-house of the prosecutrix, Susan A. Andres, who testified:
That she was the widow of Elisha J. Andres, who died in July, 1873, leaving her and four infant children. Her husband also left a daughter, by a former marriage, Hannah, the wife of Robert Melvin, all of the children living. After the death of her husband she, with her four infant children continued to occupy the premises left by her husband — the married daughter living elsewhere. The house which was burned 11th October, 1873, was situated on the premises, about one hundred and fifty yards from the dwelling, with a fence between; it was a log house, weatherboarded and covered with shingles, with brick pillars and chimney. It had once been used as a dwelling, and had been occupied by negroes, but when burned (89) *Page 82 
it was in her possession and occupation, and used for storing fodder, being half full of fodder at the time it was burned.
The witness further stated that the house was set on fire in the fore part of the night, as near as she could say, before 12 o'clock. Joe Andres was at her house the night on a visit and discovered the fire first. Witness had been lying down, but her baby being sick, she got up and saw the fodder on fire and the flames coming out of the door.
Witness had known prisoner for about a year; he did not live in the neighborhood. The prisoner wanted to rent her turpentine and farming lands, but she would not let him; he then proposed to come on her place and superintend for her; this she also declined. He accused the witness of breaking up a match between him and her sister. On one Sunday night, several weeks before the fire, the prisoner came to her house in a drinking condition and abused her. He said he believed that the witness broke up his match, and threw up to her about a young man's riding with her sister. She told him that her sister had ridden with a gentleman. He said "it was a d____d lie; that he was as d____d a rascal as there was in Sampson County." Witness then gave him orders to stay away.
The house was burned on Saturday night. On the Friday night before, the prisoner came to her house and said Dr. Kerr asked him to come by and tell her that he was going over South River and would call at her house in passing. (This, Dr. Kerr, on his examination, denied.) The prisoner, on this occasion, came to her house in a sulkey, and staid all night. Witness permitted him to do this because she was afraid of him. He left on Saturday morning before she got up. He was driving a mule in the sulkey. On Sunday morning she went out to look at the burnt house, and noticed some tracks of a man within fourteen steps of the house, the grass having been for that distance burned off. The tracks came from up the road, through the field from the direction of South River bridge. From the river to the (90) witness' house is a half mile, the road being so shut up that vehicles cannot pass. Witness followed the track towards and near the bridge; traced them through and outside of the field to a place near where tracks of a sulkey and mule were discovered. The sulkey tracks came from over the bridge and returned in that direction. The tracks of the man went to her lot gate, to the stable, and then back to the gate and down the road. Her own horse had been turned out of the stable. The tracks, in her opinion, were the tracks of the prisoner. She had noticed his tracks a good deal. He wore boots with a star on the heels; the heels of the boots were capped with brass, in the middle of which a star was cut; he wore such boots on Friday; witness noticed the stars in the tracks; and the size of the tracks *Page 83 
corresponded with his. Prisoner had a peculiar way of walking, causing a pressure on the side of the foot; the tracks showed this; they looked pressed.
This witness further stated that one night, not quite three weeks before this outhouse was burned, she had another house burned across the Bladen line, some three miles distant. On the morning she heard of it she remarked to the prisoner, who was at her house, that she did not think she had enemies round there who would do that. He replied, "You ought to know who your enemies were; they are Bob Melvin and Calhoun Melvin." He then asked how much turpentine she had. She told him she did not know, as it had not been dipped out. He said, "my best advice to you is, to have it dipped out and bunched; he would not be at all surprised if, in three weeks, there would not be a building on that hill, from the threats of Bob Melvin, made between the forks of the road and Harrell's store."
The State then proposed to show circumstances under which the prisoner came to and entered the house of the prosecutrix, Mrs. Andres, on the occasion of the conversation just stated. After objection on the part of prisoner's counsel, by leave of the Court, the witness further stated:
The night the first house was burned, just before day, the (91) prisoner came to her house and knocked and called, and asked if we were all dead or asleep. She knew his voice but made no answer. He then knocked out a nail which fastened the window, raised the window, got in and went up stairs. Next morning he was sitting on the piazza. Here the counsel of the prisoner objected to the reception of the evidence on the ground of irrelevancy; that it had no tendency to prove the crime alleged, and was calculated to prejudice the prisoner's case improperly.
In reply the Solicitor urged that these were acts and doings of the prisoner connected with the premises and showing his animus to the prosecutrix, and ought to be considered in connection with the insinuations made by him that morning against Bob and Calhoun Melvin, the falsity of which insinuations and threats the State expected to be able to prove. (Subsequently the State offered evidence tending to disprove the declarations of the prisoner concerning the same.)
His Honor overruled the objection and admitted the evidence. And the prisoner excepted.
There being no further exception to the evidence, which was all circumstantial, it is unnecessary to detail it.
In his charge to the jury his Honor adverted to the different counts in the indictment, and charged the jury that they might disregard all the other counts as unsupported by proof and confine their attention *Page 84 
to the consideration of the evidence relating to the fourth count, and that if they were satisfied fully from the evidence that the house burned was, at the time, in the possession and occupation of Susan A. Andres, and used by her for the storage of fodder and contained her fodder at the time it was burned, that so far as the description of property was concerned, it was aptly described in the fourth count of the indictment as a certain out-house of one Susan A. Andres.
At the conclusion of the charge the prisoner's counsel handed (92) to his Honor special written instructions asking that they might be given to the jury, to wit:
(1) That the State must prove the property as laid in the indictment, and that here is no evidence of title, and only evidence of possession of the house charged to have been burnt.
(2) That the State must make out beyond a reasonable doubt the title to the house burned; and if the State fails so to do, the jury must acquit.
(3) That proof of possession is not proof of ownership of land. His Honor declined to modify his instructions before given or to give those asked, whereupon prisoner again excepted.
Verdict, guilty on the fourth count of the indictment. Rule for a new trial granted, and discharged. Judgment and appeal by the prisoner.
I. The first exception of the defendant is to the admissibility of the evidence. This objection is untenable because the evidence being wholly circumstantial, it was proper to show the malice of the defendant by his own acts and declarations as a link in the chain fixing him as the guilty party. It was not irrelevant, and if so, could not mislead the jury. Statev. Arnold, 35 N.C. 184.
II. The ownership of the out-house not properly charged in the indictment. This is also untenable.
It has been held that even a person who had gone into bankruptcy and made an assignment of his real estate to the assignee, but had not given up the possession, may be charged as the owner of the house. Also that a tenant at will in the occupation, or even a lodger, may be charged as the owner. Arch. Crim. Pl., 488; Rex v. Ball, Reg. and M., 30; State v. Mason, 35 N.C. 341; 44 N.C. 197; Bat. (93) Rev., Ch. 33, Sec. 93; 2 East. P.C., 505; Arch. Crim. Pl., 336.
Elisha Andres, the owner of the premises, had died and his widow Susan remained in occupation of the land and houses, and was *Page 85 
using the out-house at the time of the burning. She was not in the wrongful possession and was properly charged as the owner of the building which was burned.
III. Special instructions were asked for and denied. His Honor charged the jury that if they were fully satisfied from the evidence that the house burned was at the time in the possession and occupation of Susan Andres, as described in the fourth count of the indictment, it was aptly laid as the out-house of Susan Andres. This instruction covered the first instruction asked by the defendant, to wit, "That the State must prove property as laid in the indictment." The other instructions asked for were properly refused as containing propositions which were untrue in law.
There is no error.
PER CURIAM. Judgment affirmed.
Cited: Deming v. Gainey, 95 N.C. 532; S. v. Thomson, 97 N.C. 498; S.v. Lytle, 117 N.C. 802; S. v. Daniel, 121 N.C. 576; S. v. Battle,126 N.C. 1047; S. v. Sprouse, 150 N.C. 861; S. v. Clark,, 173 N.C. 745;S. v. Kincaid, 183 N.C. 716; S. v. Freeman, 183 N.C. 747; S. v.McClain, 240 N.C. 175; S. v. Long, 243 N.C. 396.